**No. 26-1317**

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

ELI LILLY AND COMPANY,

*Plaintiff-Appellant*,

v.

WILLOW HEALTH SERVICES, INC.,

*Defendant-Appellee*.

On Appeal from the United States District Court for the
Central District of California,
No. 25-cv-03570

# BRIEF FOR APPELLANT ELI LILLY AND COMPANY

ERIN E. MURPHY
MATTHEW D. ROWEN
*Counsel of Record*
KYLE R. EISWALD
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
matthew.rowen@clementmurphy.com

*Counsel for Appellant*

July 24, 2026

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

STATEMENT OF JURISDICTION ........ 4

STATEMENT OF THE ISSUE ........ 4

STATUTORY PROVISIONS ........ 4

STATEMENT OF THE CASE ........ 4

A. Legal Background ........ 4

B. Factual Background ........ 6

1. Lilly, Mounjaro®, and Zepbound® ........ 6

2. Compounding ........ 10

3. Willow, and its false and misleading claims ........ 15

C. Procedural Background ........ 23

SUMMARY OF ARGUMENT ........ 26

STANDARD OF REVIEW ........ 29

ARGUMENT ........ 29

I. Lilly Has Article III Standing ........ 29

II. Lilly Has A Cause Of Action ........ 33

A. The Fact That Willow Competes for Lilly's Customers Suffices to Allow Lilly to Sue Under §1125(a)(1) ........ 35

B. Even Without the *TrafficSchool* Presumption, Lilly Pleaded a Valid Lanham Act Cause of Action ........ 38

1. Lilly is clearly within the Lanham Act's zone of interests ........ 38

2. Willow's misrepresentations proximately caused Lilly's injuries ........ 40

CONCLUSION ........ 53

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

STATUTORY ADDENDUM

## TABLE OF AUTHORITIES

### Cases

*Allergan USA Inc. v. Imprimis Pharms., Inc.*,
2017 WL 10526121 (C.D. Cal. Nov. 14, 2017) .......... 50

*Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*,
821 F.3d 352 (2d Cir. 2016) .......... 33

*Campfield v. Safelite Grp., Inc.*,
91 F.4th 401 (6th Cir. 2024) .......... 45

*City of Oakland v. Wells Fargo & Co.*,
14 F.4th 1030 (9th Cir. 2021) .......... 34, 51

*Colwell v. HHS*,
558 F.3d 1112 (9th Cir. 2009) .......... 29

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
539 U.S. 23 (2003) .......... 5

*Eli Lilly & Co. v. Adonis Health, Inc.*,
2025 WL 2721684 (N.D. Cal. Sept. 24, 2025) .......... 50

*Eli Lilly & Co. v. Aios, Inc.*,
2026 WL 836624 (N.D. Cal. Mar. 26, 2026) .......... 50

*Eli Lilly & Co. v. Mochi Health Corp.*,
2026 WL 1076831 (N.D. Cal. Apr. 20, 2026) .......... 37, 50

*Hall v. Smosh Dot Com, Inc.*,
72 F.4th 983 (9th Cir. 2023) .......... 30

*Hemi Grp., LLC v. City of New York*,
559 U.S. 1 (2010) .......... 51

*Holmes v. Sec. Inv. Prot. Corp.*,
503 U.S. 258 (1992) .......... 47, 51

*Idaho Conservation League v. Bonneville Power Admin.*,
83 F.4th 1182 (9th Cir. 2023) .......... 31

*In re Gilead Scis. Secs. Litig.*,
536 F.3d 1049 (9th Cir. 2008)....29

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*,
774 F.3d 935 (9th Cir. 2014)....47

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
304 F.3d 829 (9th Cir. 2002)....5

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)....5, 6, 33-46, 49, 51, 52

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992).... 29, 30

*Maya v. Centex Corp.*,
658 F.3d 1060 (9th Cir. 2011)....31

*Muhler Co. v. Ply Gem Holdings, Inc.*,
637 F.App'x 746 (4th Cir. 2016)....46

*Novo Nordisk A/S v. Ikon Health LLC*,
2026 WL 196475 (E.D. Wash. Jan. 26, 2026)....42

*O'Handley v. Weber*,
62 F.4th 1145 (9th Cir. 2023)....31

*Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*,
165 F.Supp.3d 937 (S.D. Cal. 2016)....38

*Outsourcing Facilities Ass'n v. FDA*,
2025 WL 746028 (N.D. Tex. Mar. 5, 2025)....13

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*,
943 F.3d 1243 (9th Cir. 2019).... 50, 51

*Paroline v. United States*,
572 U.S. 434 (2014).... 47, 49

*PhotoMedex, Inc. v. Irwin*,
601 F.3d 919 (9th Cir. 2010)....5

*POM Wonderful LLC v. Coca-Cola Co.*,
573 U.S. 102 (2014)........................................................ 5, 6, 33, 35, 49, 52

*Ray Charles Found. v. Robinson*,
795 F.3d 1109 (9th Cir. 2015) ......................................................................37

*Scilex Pharms. Inc. v. Sanofi-Aventis U.S. LLC*,
2021 WL 11593043 (N.D. Cal. Aug. 16, 2021)................................................50

*SmileDirectClub, LLC v. Tippins*,
31 F.4th 1110 (9th Cir. 2022) ............................................................... 31, 33

*Souza v. Exotic Island Enters., Inc.*,
68 F.4th 99 (2d Cir. 2023)................................................................ 36, 37, 46

*ThermoLife Int'l, LLC v. Compound Sols., Inc.*,
848 F.App'x 706 (9th Cir. 2021)............................................. 36, 37, 39, 42, 49

*TrafficSchool.com, Inc. v. Edriver Inc.*,
653 F.3d 820 (9th Cir. 2011) .............................................6, 23, 27, 30, 35-37, 46

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)........................................................................................30

*United States v. Cadden*,
965 F.3d 1 (1st Cir. 2020) ..............................................................................12

*Vericool World, LLC v. Igloo Prods. Corp.*,
175 F.4th 1045 (9th Cir. 2026)............................................................... 30, 40

*Verizon Md. Inc. v. Public Serv. Comm'n*,
535 U.S. 635 (2002)........................................................................................36

*Vicious Brands, Inc. v. Face Co., LLC*,
2026 WL 276178 (N.D. Cal. Feb. 3, 2026) ......................................................46

**Statutes**

15 U.S.C. §1125(a).............................................................................................35

15 U.S.C. §1125(a)(1) ................................................................................. 5, 23

15 U.S.C. §1127 ....................................................................................................5

21 U.S.C. §321(n) ....................8

21 U.S.C. §352(a)(1) ....................8

21 U.S.C. §352(n) ....................8

21 U.S.C. §353a(a) ....................11

21 U.S.C. §353a(b)(1) ....................12

21 U.S.C. §353b(a)(2) ....................13

21 U.S.C. §353b(a)(5) ....................12

21 U.S.C. §355(a) ....................7

21 U.S.C. §355(b)(1) ....................8

21 U.S.C. §355(c)(3) ....................10

21 U.S.C. §355(j)(5) ....................10

21 U.S.C. §355(k) ....................8

21 U.S.C. §355(*o*)(3) ....................8

21 U.S.C. §355(*o*)(4) ....................8

21 U.S.C. §356e(a) ....................13

21 U.S.C. §360eee-1 ....................8

Pub. L. No. 106-387, 114 Stat. 1549 (2000) ....................8

Pub. L. No. 79-489, 60 Stat. 427 (1946) ....................4

**Rule and Regulations**

Fed. R. App. P. 4(a)(1) ....................4

21 C.F.R. §312.21 ....................7

21 C.F.R. §314.81(b)(3) ....................13

21 C.F.R. pt. 210 ....................7

21 C.F.R. pt. 211 ....................7

**Other Authorities**

Abdulrahman A. Alagga et al., *Drug Absorption*, StatPearls Publishing LLC (Feb. 27, 2024), https://perma.cc/4KDW-49J5 ....................22

Am. Diabetes Ass'n, *The American Diabetes Association Announces Statement on Compounded Incretin Products* (Dec. 2, 2024), https://perma.cc/752H-XQG3 ....................15

Biotechnology Innovation Org., *Clinical Development Success Rates and Contributing Factors 2011-2020* (Feb. 2021), https://perma.cc/MD7C-2P3F ....................8

C. James Watson et al., *Pharmaceutical Compounding: A History, Regulatory Overview, and Systematic Review of Compounding Errors*, 17(2) J. Med. Toxicology 197 (2020), https://perma.cc/6FCA-45XK ....................11

Charlotte Huffman & Mark Smith, *Dozens Say They Lost Eyesight After Routine Surgery Using Compounded Pharmacy Drugs*, WFAA, https://perma.cc/X3E4-6RRA ....................13

Cong. Rsch. Serv., R45069, *Drug Compounding: FDA Authority and Possible Issues for Congress* (Jan. 5, 2018), https://perma.cc/6ZZN-CD5P ....................10, 11

Dep't of Health, Disability and Ageing, *Protecting Australians From Unsafe Compounding of Replica Weight Loss Products* (May 22, 2024), https://perma.cc/G4PW-JRLW ....................14

Fed. Trade Comm'n, *Health Products Compliance Guide* (Dec. 2022), https://perma.cc/Y5ZQ-EW8X ....................17

Letter from Shannon Glueck, Pharm.D., U.S. Food & Drug Admin., to Philip Dickison, PhD, RN, Nat'l Council of State Bds. of Nursing (July 16, 2024), https://perma.cc/5SAGBRBX ....................14

Nat'l Ass'n of Attys' Gen., *State and Territory Attorneys General Urge FDA to Take Action Against Counterfeit and Illegally Sold GLP-1 Drugs* (Feb. 19, 2025), https://perma.cc/2SVU-YX2V ....................14

Nat'l Consumers League, *NCL Urges the Public to Heed Warnings About Unregulated Versions of GLP-1 Weight Loss Drugs* (Feb. 4, 2025), https://perma.cc/8NNE-7Z5G ....................15

Pew Charitable Trusts, *U.S. Illnesses and Deaths Associated With Compounded or Repackaged Medications, 2001-19* (Mar. 2, 2020), https://perma.cc/H48G-4378 ....................12

Pharm. Rsch. & Mfrs. of Am., *Research and Development Policy Framework*, https://perma.cc/CMZ4-ND43 ....................9

U.S. Food & Drug Admin., *Compounding and the FDA: Questions and Answers* (Sept. 16, 2025), https://perma.cc/3TCV-WEU6 ....................11

U.S. Food & Drug Admin., *FDA Approves First Medication for Obstructive Sleep Apnea* (Dec. 20, 2024), https://perma.cc/G6EC-WX2D ....................9

U.S. Food & Drug Admin., *FDA Approves New Medication for Chronic Weight Management* (Nov. 8, 2023), https://perma.cc/L2HY-WSXU ....................9

U.S. Food & Drug Admin., *FDA Approves Novel, Dual-Targeted Treatment for Type 2 Diabetes* (May 13, 2022), https://perma.cc/MY42-WKCG ....................9

U.S. Food & Drug Admin., *FDA's Concerns With Unapproved GLP-1 Drugs Used For Weight Loss*, https://perma.cc/8BLY-MVK3 ....................14

U.S. Food & Drug Admin., *Investigational New Drug (IND) Application* (June 17, 2026), https://perma.cc/Y5YH-H4NZ ....................7

U.S. Food & Drug Admin., *Resolution of Tirzepatide Injection Product Shortage and Supply Status* (Dec. 19, 2024), https://perma.cc/7MPN-AFE7 ....................20

U.S. Food & Drug. Admin., *FDA Alerts Health Care Providers, Compounders and Patients of Dosing Errors Associated with Compounded Injectable Semaglutide Products* (Jul. 26, 2024), https://perma.cc/3GYV-7NQK ....................12

Willow, *About Page*, https://perma.cc/QM9G-JX2M ....................15

Willow, *Home Page*,
https://perma.cc/4KLT-KAAJ ................................................................ 15, 18, 23

Willow, *Tirzepatide Product Page*,
https://perma.cc/9ES3-USYF ........................................................ 16, 17, 19, 48

## INTRODUCTION

The basic question on appeal in this case is whether a pharmaceutical manufacturer that spends years and millions of dollars securing FDA approval to sell transformative prescription medicines can bring suit under the Lanham Act against a telehealth company that, through deceptive advertising, misleads consumers into buying harmful knockoffs. The answer to that question should be obvious—yes. Indeed, court after court has held that prescription-drug manufacturers may bring Lanham Act actions against companies that use misrepresentations to steer unwitting consumers their way. But the district court here held otherwise. The court did not dispute that companies that mislead consumers into buying (untested and unreliable) compounded knockoffs instead of the (FDA-approved) genuine articles divert customers away from the manufacturer whose drugs they are copying. Nor did it deny that manufacturers suffer reputational harm when a consumer who was swindled into buying an inferior knockoff attributes the knockoff to the manufacturer of the genuine article. Yet it nonetheless held that manufacturers lack standing to sue under the Lanham Act anytime a physician's prescribing decision stands between a huckster's false advertising and a consumer's purchase—which will be almost every case involving prescription drugs. The decision below effectively exempts prescription-drug-related false advertising from the Lanham Act. That is not—and cannot be—the law. This Court should make that clear and reverse.

Plaintiff-Appellant Eli Lilly and Company ("Lilly") is a medicine company that has pioneered countless life-changing discoveries over its nearly 150-year existence. Two of Lilly's most recent discoveries are Zepbound® and Mounjaro®, both of which contain the active pharmaceutical ingredient tirzepatide. Lilly's tirzepatide medicines target patients' GLP-1 (glucagon-like peptide-1) and GIP (glucose-dependent insulinotropic polypeptide) receptors to improve blood-sugar control and reduce patients' appetite and food intake. Zepbound® and Mounjaro® have undergone testing in 37 completed clinical trials (with more ongoing), and they are the only tirzepatide-based medicines FDA has approved.

Defendant-Appellee Willow Health Services, Inc. ("Willow") is a telehealth platform and online retailer. Since almost the very moment Lilly's products entered the market, Willow has sold mass-compounded knockoffs that contain tirzepatide. Willow has told consumers, both explicitly and implicitly, that its products have *also* undergone "extensive testing" and *also* are clinically proven to result in weight loss. Willow promises "personalized" treatment. And Willow has even represented that its tirzepatide products provide "better results" than Lilly's FDA-approved products.

All of that is false. Willow's drugs have not undergone "extensive testing," let alone been approved by any federal or state regulator as safe and effective for weight loss. Willow does not "personalize" anything; Willow sells standardized, one-size-fits-all formulations of compounded tirzepatide, mixed with unstudied

additives like glycine and niacinamide, regardless of individual patient needs. And far from offering "better results" than Lilly's FDA-approved tirzepatide products, the compounded tirzepatide products Willow sells pose real health risks that have been cited by physicians' groups and federal, state, and international regulators.

Willow's illicit advertising plainly violates the Lanham Act, and it just as plainly harms Lilly (not to mention the public). Yet despite Willow's clear misrepresentations and the equally clear economic and reputational harms it has caused (and continues to cause) Lilly, the district court held that Lilly lacks so-called "statutory standing"—*and even Article III standing*—and thus cannot sue Willow under the Lanham Act. The court agreed that Lilly plausibly alleged that Willow directly competes with it for customers and that Willow's false advertising has caused it to lose sales and goodwill with customers, which places Lilly's suit squarely in the Lanham Act's heartland. But because obtaining any prescription drug (including tirzepatide-based products) requires a prescription from a physician, the district court held that Lilly cannot show that Willow's false advertising proximately caused Lilly's injuries as a matter of law.

That holding contravenes Supreme Court and Ninth Circuit precedent and blows a gaping hole in the Lanham Act, effectively shielding from liability all false advertising of prescription drugs. Neither law nor logic supports that perverse result. This Court should reverse.

## STATEMENT OF JURISDICTION

The district court had federal-question jurisdiction over Lilly's Lanham Act claim pursuant to 15 U.S.C. §1121 and 28 U.S.C. §1331, as well as diversity jurisdiction pursuant to 28 U.S.C. §1332 because the parties are citizens of different states and the matter in controversy exceeds $75,000. The district court dismissed Lilly's First Amended Complaint ("FAC") with prejudice on February 20, 2026. 1-ER-3. Lilly filed a timely notice of appeal on March 2, 2026. 3-ER-452; *see* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction pursuant to 28 U.S.C. §1291.

## STATEMENT OF THE ISSUE

Whether the manufacturer of a prescription medicine can bring a Lanham Act false-advertising suit against an enterprise that uses false advertising to steer consumers away from the manufacturer's product and toward competing knockoffs.

## STATUTORY PROVISIONS

Pursuant to Ninth Circuit Rule 28-2.7, pertinent statutory provisions are set forth in an addendum to this brief.

## STATEMENT OF THE CASE

### A. Legal Background

Congress enacted the Lanham Act 80 years ago, *see* Pub. L. No. 79-489, 60 Stat. 427 (1946), to "mak[e] actionable the deceptive and misleading use of marks in [interstate] commerce," "to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations," and, as

particularly relevant here, "to protect persons engaged in such commerce against unfair competition." 15 U.S.C. §1127. "While much of the Lanham Act addresses the registration, use, and infringement of trademarks and related marks," *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 29 (2003), "the Act also creates a federal remedy 'that goes beyond trademark protection,'" *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107 (2014) (quoting *Dastar*, 539 U.S. at 29). To that end, the Lanham Act "explicitly furnishes a private right of action 'against persons who make false and deceptive statements in a commercial advertisement about their [own] product.'" *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 923 (9th Cir. 2010) (quoting *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 834-35 (9th Cir. 2002)); *see* 15 U.S.C. §1125(a)(1)(B) (authorizing the filing of "a civil action by any person who believes that he or she is," has been, "or is likely to be damaged by" the "use[] in commerce" of any "false or misleading description of fact, or false or misleading representation of fact, which … misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods").

This "broader remedy," *POM Wonderful*, 573 U.S. at 107, allows commercial actors to protect themselves from, and obtain redress for, "injuries to [their] business reputation[s] and present and future sales," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131 (2014). But it does more than just protect

harmed commercial actors' bottom lines; it also serves the public interest more generally. In vindicating their own reputational and economic interests from unfair competition, "competitor" plaintiffs "act as the fabled vicarious avenger[s] of the consuming public" by helping remove deceptive advertising from the marketplace and holding bad actors accountable for their misdeeds. *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 827 (9th Cir. 2011); *see also POM Wonderful*, 573 U.S. at 107 ("consumers also benefit from the Act's proper enforcement"). Indeed, the Lanham Act's "private remedy" for false advertising "may be invoked *only* by those who 'allege an injury to a commercial interest in reputation or sales.'" *Id.* (emphasis added) (quoting *Lexmark*, 572 U.S. at 131-32).

## B. Factual Background

### 1. Lilly, Mounjaro®, and Zepbound®

Lilly is an international medicine company that has pioneered countless life-changing discoveries throughout its nearly 150-year existence. Today, Lilly's medicines help tens of millions of patients across the globe. 2-ER-104 ¶20.

Lilly manufactures its medicines under strict controls in state-of-the-art facilities, which employ thousands of highly specialized personnel to ensure that Lilly's medicines meet rigorous quality and safety standards. 2-ER-104 ¶21. Transforming active pharmaceutical ingredients ("APIs") into medicine is a complex, methodical, and science-based process. Lilly follows current Good

Manufacturing Practices ("cGMP") across the design, monitoring, and control of manufacturing processes and facilities, from establishing robust quality management systems to obtaining quality raw materials and detecting and investigating product-quality deviations. 2-ER-104-05 ¶21; *see* 21 C.F.R. pts. 210 & 211. Each step—from chemical synthesis of the API to formulation, device assembly, and packaging—requires extensive testing, controls, and specialized equipment.

That is all by design. Prescription medicines generally cannot be sold in the United States without FDA approval, *see* 21 U.S.C. §355(a), and securing FDA approval is no mean feat. Each new drug must be evaluated through three increasingly complex phases of studies, typically culminating in double-blind, multi-center, placebo-controlled clinical trials. During this process, a would-be manufacturer must disclose information pertaining to "the composition, manufacturer, stability, and controls used for manufacturing" the API contained in the drug candidate "to ensure that the company can adequately produce and supply consistent batches of the drug." U.S. Food & Drug Admin., *Investigational New Drug (IND) Application* (June 17, 2026), https://perma.cc/Y5YH-H4NZ. And the three phases of clinical testing help ensure that any medicine that makes it to market is both safe and effective for a particular indication over a range of doses. *See* 21 C.F.R. §312.21. Fewer than 10% of drug candidates survive this gauntlet. Biotechnology Innovation Org., *Clinical Development Success Rates and*

*Contributing Factors 2011-2020*, at 3, 10 (Feb. 2021), https://perma.cc/MD7C-2P3F.

If a drug candidate makes it through the clinical-trial process, the manufacturer must then submit a marketing application—either a New Drug Application ("NDA") or Biologics License Application ("BLA"), depending on the nature of the molecule—detailing (among many, many other things) each component of the drug, each facility involved in its production, and all procedures and processes to be followed in producing it. *See* 21 U.S.C. §355(b)(1)(A)(i)-(viii). FDA generally will not approve an application without first inspecting every facility involved in its production to assess cGMP compliance. And even when FDA approves an application and permits the manufacturer to sell and market a new medicine, the agency's oversight continues. FDA requires manufacturers to track and trace each finished product, to promptly report all adverse events, and to conduct further post-approval studies. *See id.* §360eee-1 (track-and-trace); *id.* §355(k) (adverse-event reporting); *id.* §355(*o*)(3) (post-approval studies). FDA also continually monitors product-related advertising and promotion to ensure that it is not misleading and that it adequately discloses risks. *See id.* §§321(n), 352(a)(1), 352(n), 355(*o*)(4).

It is thus no wonder that FDA approval is considered "the gold standard for safety and effectiveness." Pub. L. No. 106-387, §745(b)(5), 114 Stat. 1549, 1549A-36 (2000). Nor is it any wonder that securing FDA approval demands enormous

investments in time and money. "On average, it takes 10-15 years and costs $2.6 billion to develop one new medicine." Pharm. Rsch. & Mfrs. of Am., *Research and Development Policy Framework*, https://perma.cc/CMZ4-ND43.

This case is about two of Lilly's FDA-approved products—Mounjaro® and Zepbound®, groundbreaking treatments containing a macromolecule Lilly discovered called tirzepatide—for which Lilly secured FDA approval in 2022 and 2023, respectively. As formulated by Lilly, these medicines target patients' glucagon-like peptide-1 ("GLP-1") and glucose-dependent insulinotropic polypeptide ("GIP") receptors; Mounjaro® and Zepbound® activate both receptors to improve blood sugar control and reduce appetite and food intake. U.S. Food & Drug Admin., *FDA Approves Novel, Dual-Targeted Treatment for Type 2 Diabetes* (May 13, 2022), https://perma.cc/MY42-WKCG; U.S. Food & Drug Admin., *FDA Approves New Medication for Chronic Weight Management* (Nov. 8, 2023), https://perma.cc/L2HY-WSXU. Both medicines meet critical patient needs: FDA has approved Mounjaro® to treat type-2 diabetes and has approved Zepbound® to treat chronic weight management and obstructive sleep apnea in certain adults. *Id.*; U.S. Food & Drug Admin., *FDA Approves First Medication for Obstructive Sleep Apnea* (Dec. 20, 2024), https://perma.cc/G6EC-WX2D.

Mounjaro® and Zepbound® are injectables, *i.e.*, they are administered via under-the-skin injections; FDA has not approved (and Lilly does not sell) any

tirzepatide-based product in oral form. 2-ER-108 ¶35. Lilly is the only lawful source of mass-produced tirzepatide in the United States, and Mounjaro® and Zepbound® are the only FDA-approved tirzepatide-based products. 2-ER-108 ¶¶34-35. Finally, because tirzepatide is a new active ingredient not previously approved by FDA, Lilly earned new-chemical-entity exclusivity for tirzepatide, which means that FDA cannot accept an application from any other person for any other tirzepatide-based product until at least May 13, 2027. *See* 21 U.S.C. §355(c)(3)(E)(ii), (j)(5)(F)(ii).

### 2. Compounding

Although prescription drugs generally may not be sold in the United States without FDA approval, federal law provides a narrow exception for so-called "compounded" drugs. "Drug compounding is a process by which a pharmacist or physician combines, mixes, or alters various drug ingredients to create a drug to meet the unique needs of an individual patient." Cong. Rsch. Serv., R45069, *Drug Compounding: FDA Authority and Possible Issues for Congress*, at 1 (Jan. 5, 2018), https://perma.cc/6ZZN-CD5P (hereinafter, "CRS 2018"). For example, if an individual patient is allergic to gelatin but the medicine her doctor prescribes comes only in gelcaps, a compounding pharmacy may be permitted to produce a non-gelcap drug for that individual patient. *Id.*; *see also* C. James Watson et al., *Pharmaceutical Compounding: A History, Regulatory Overview, and Systematic Review of*

*Compounding Errors*, 17(2) J. Med. Toxicology 197, 198 (2020), https://perma.cc/6FCA-45XK ("Patients may be allergic to binding agents … or other inactive ingredients in commercially available formulations.").

As compared with rigorously tested, FDA-approved medicines like Lilly's, compounded products occupy the other end of the regulatory spectrum. Unlike with FDA-approved products, "FDA does not verify the safety, effectiveness, or quality of compounded drugs before they are marketed." U.S. Food & Drug Admin., *Compounding and the FDA: Questions and Answers* (Sept. 16, 2025), https://perma.cc/3TCV-WEU6. What is more, compounded products do not undergo any kind of clinical trials; they often are produced without following cGMP; they usually are not subject to pharmacovigilance requirements like adverse event reporting; and FDA generally does not even know what compounded products are produced or sold, where they are made, or by whom. CRS 2018 at 13, 17-19.

For those reasons, compounding is very much the exception, not the rule—or at least that is how things are supposed to work. Under federal law, any compounded drug must be made specifically for an identified patient based on an identified medical need that renders the commercially available, FDA-approved product medically inappropriate for that specific patient. *See* 21 U.S.C. §353a(a); U.S. Food & Drug. Admin., *FDA Alerts Health Care Providers, Compounders and Patients of Dosing Errors Associated with Compounded Injectable Semaglutide Products* (Jul.

26, 2024), https://perma.cc/3GYV-7NQK ("Compounded drugs should only be used for patients whose medical needs cannot be met by an available FDA-approved drug."). In other words, while it created a narrow allowance for medically necessary one-off alterations to certain prescription drugs, Congress has made clear that this limited permission for medically necessary compounding is not an excuse to mass-produce knockoffs of products that otherwise enjoy exclusivity. *See* 21 U.S.C. §353a(b)(1)(D) (pharmacies and physicians may not "compound regularly or in inordinate amounts … drug products that are essentially copies of a commercially available drug product"); *id.* §353b(a)(5) (so-called "outsourcing facilities" generally may not compound "essentially a copy of one or more approved drugs" either).

Those limitations are critical to public health and safety, as compounded products can pose serious risk to patients, particularly when produced at scale. The known cases of compounding-caused injuries are harrowing. *See, e.g.*, *United States v. Cadden*, 965 F.3d 1, 7-8 (1st Cir. 2020) (scores died and hundreds more were injured by compounded Depo-Medrol® injection contaminated with fungal meningitis); Pew Charitable Trusts, *U.S. Illnesses and Deaths Associated With Compounded or Repackaged Medications, 2001-19* (Mar. 2, 2020), https://perma.cc/H48G-4378; Charlotte Huffman & Mark Smith, *Dozens Say They Lost Eyesight After Routine Surgery Using Compounded Pharmacy Drugs*, WFAA,

(last updated Feb. 13, 2019), https://perma.cc/X3E4-6RRA. And many more harmful (or even fatal) cases likely remain unknown, because compounders generally do not report adverse events.

The problems with compounding at scale have risen to the surface in the short time since Lilly's tirzepatide products first became available. For a time after Mounjaro® and Zepbound® initially came on the market, Lilly experienced greater demand than it could accommodate, reflecting the medicines' immense value to patients and healthcare providers. After Lilly informed FDA that it projected excess demand for its then-recently-approved tirzepatide products, the agency placed Mounjaro® and Zepbound® on its statutorily mandated drug-shortage list in December 2022 and April 2024, respectively. 2-ER-130-31 ¶¶104-05; *see* 21 U.S.C. §356e(a) (FDA "maintain[s] an up-to-date list of drugs … in shortage"). In response to FDA's shortage determinations, many entities began mass-producing untested and potentially unsafe compounded tirzepatide products at unprecedented scales. *See Outsourcing Facilities Ass'n v. FDA*, 2025 WL 746028, at *2 (N.D. Tex. Mar. 5, 2025); 21 U.S.C. §353b(a)(2)(A)(ii); 21 C.F.R. §314.81(b)(3)(iii)(d)(1), (f).

It did not take long for serious problems to arise. In July 2024, FDA highlighted "reports describing patients who experienced adverse events following the administration of compounded … tirzepatide." Letter from Shannon Glueck, Pharm.D., U.S. Food & Drug Admin., to Philip Dickison, PhD, RN, Nat'l Council

of State Bds. of Nursing at 1 (July 16, 2024), https://perma.cc/5SAGBRBX. FDA later advised of "multiple reports of adverse events, some requiring hospitalization, that may be related to dosing errors" associated with compounded GLP-1 drugs. U.S. Food & Drug Admin., *FDA's Concerns With Unapproved GLP-1 Drugs Used For Weight Loss* (content current as of June 15, 2026), https://perma.cc/8BLY-MVK3; *see also id.* (discussing the agency's "[c]oncerns with compounded versions of these drugs" and noting that patients have needed "medical attention" as a result of taking compounded tirzepatide products).

FDA was not alone in sounding the alarm. A bipartisan group of State Attorneys General called for "decisive action" on these unsafe and unapproved products. Nat'l Ass'n of Attys' Gen., *State and Territory Attorneys General Urge FDA to Take Action Against Counterfeit and Illegally Sold GLP-1 Drugs* (Feb. 19, 2025), https://perma.cc/2SVU-YX2V. The Government of Australia banned compounded anti-obesity drugs altogether due to "increasing reports of patients coming to harm." Dep't of Health, Disability and Ageing, *Protecting Australians From Unsafe Compounding of Replica Weight Loss Products* (May 22, 2024), https://perma.cc/G4PW-JRLW. And leading patient and consumer groups domestically have likewise warned that patients should avoid compounded tirzepatide products altogether "due to uncertainty about their content, safety, quality, and effectiveness." Nat'l Consumers League, *NCL Urges the Public to Heed*

*Warnings About Unregulated Versions of GLP-1 Weight Loss Drugs* (Feb. 4, 2025), https://perma.cc/8NNE-7Z5G; Am. Diabetes Ass'n, *The American Diabetes Association Announces Statement on Compounded Incretin Products* at 1 (Dec. 2, 2024), https://perma.cc/752H-XQG3.

### 3. Willow, and its false and misleading claims

Willow is a telehealth platform and online retailer for compounded weight-loss drugs. It purports to "specialize in providing expert care for weight loss" and to offer "individualized, specialized treatments," Willow, *About Page*, https://perma.cc/QM9G-JX2M; 2-ER-115 ¶54; Willow's website repeatedly describes its offerings as "personalized and "[c]ustom," *see, e.g.*, Willow, *Home Page*, https://perma.cc/4KLT-KAAJ ("Home Page").[1] At the time Lilly's FAC was filed, Willow's website promoted multiple different weight-loss drugs for sale—including a "standard treatment" dubbed "Semaglutide," an "oral treatment" dubbed "Semaglutide Tablets," and a "premium treatment" dubbed "Tirzepatide" (hereinafter, "Tirzepatide Treatment" or "Treatment"). 2-ER-116 ¶56; 2-ER-153, 157. In promoting its compounded tirzepatide drugs, Willow has made numerous false and misleading statements about the nature and quality of its offerings. These can generally be assigned to four categories of claims.

[1] Willow has adjusted its website several times during this litigation to remove or alter various misleading statements. In cases where a statement did not appear on Willow's website when this brief was filed, Lilly has cited to the record below.

***Supposed Clinical Testing.*** Willow has expressly and impliedly communicated to consumers that its Tirzepatide Treatment has undergone clinical testing that supports its effectiveness. The Tirzepatide Treatment page on Willow's website told consumers that each batch of the Treatment undergoes "extensive testing" and is backed by "science." 2-ER-119 ¶65, 2-ER-120 ¶70; 2-ER-167-68; *see also* 2-ER-182-83, 186 (Willow claiming on social media that it offers "science-backed treatments" and that its drugs are "Supported by Science"). The Tirzepatide Treatment page at one time also advertised that the Treatment contains the "[s]ame active ingredient as Mounjaro® & Zepbound®." 2-ER-132 ¶108 (emphasis removed). It further boasted that consumers could "[l]ose 20% of body weight," and it used the word "clinical" several times, including a quote from a journal that said: "These highly effective anti-obesity medications are associated with weight losses of more than 10% of overall bodyweight in more than two-thirds of clinical trial participants." 2-ER-120-21 ¶69; 2-ER-121 ¶72; 2-ER-172. Willow's website also references a supposed medical team of "licensed doctors" and includes multiple images of doctors in scrubs, Willow, *Tirzepatide Product Page*, https://perma.cc/9ES3-USYF ("Tirzepatide Page"); 2-ER-123 ¶76; 2-ER-171-72, despite warnings from federal regulators that such imagery can "give an impression of scientific legitimacy and likely convey an implied claim that the product has been

clinically proven to be effective for weight loss," Fed. Trade Comm'n, *Health Products Compliance Guide* at 5 (Dec. 2022), https://perma.cc/Y5ZQ-EW8X.[2]

All these statements convey a singular, consistent, and deceptive message to consumers: Willow's Tirzepatide Treatment has been clinically tested and proven to be safe and effective for weight loss. But none of that is true. The truth is that Willow does not have any clinical testing assessing the safety and effectiveness of its Tirzepatide Treatment—a fact that Willow has acknowledged, 2-ER-179—and any clinical trials Willow has mentioned were trials for *Lilly's* tirzepatide products, not Willow's compounded knockoffs.[3]

***Supposedly Superior Treatment.*** Willow's advertising has also communicated that Willow's Tirzepatide Treatment provides superior outcomes over Lilly's FDA-approved tirzepatide products. Willow brands its Tirzepatide Treatment as its "[p]remium [t]reatment," *see* Tirzepatide Page, and it has advertised the Treatment as a "[p]remium, personalized blend with better results than Tirzepatide,"[4]

[2] It now appears that Willow has removed the references to "clinical testing"; the page currently says: "Each batch of medication undergoes quality testing."

[3] Nor could Willow piggyback on the clinical studies and articles concerning Lilly's FDA-approved tirzepatide products. Willow does not use the API formulation that was the subject of Lilly's testing. And differences in manufacturing controls and procedures can lead to substantial differences in potency and quality of an API formulation, such that results regarding Lilly-manufactured tirzepatide products do not translate to non-Lilly, compounded tirzepatide products.

[4] Since the filing of this lawsuit, Willow has changed this statement to now assert that its Treatment provides "better results than Semaglutide." Tirzepatide Page.

2-ER-167—by which it meant "better … than" *Lilly's* Mounjaro® and Zepbound®, the only FDA-approved tirzepatide products on the market, *see* pp.9-10, *supra*. This claim of superior outcomes, followed almost immediately by a reference to "extensive testing," 2-ER-167, conveyed to consumers that Willow's products have been tested against other tirzepatide-based products (namely Lilly's) and been proven to be the better option. But, again, Willow has no such testing of its products, so it has no way to substantiate any such comparative assertion.[5]

***Supposedly "Personalized" Treatment.*** Willow has also falsely claimed (and continues to falsely claim) that its products are clinically tailored and compounded specifically for each individual patient. At the time Lilly filed its FAC, Willow's Home Page expressly told consumers that Willow offered not just "[p]roven medicine" that powered weight loss, 2-ER-115-16 ¶55; 2-ER-152, but "precision medicine to *personalize trusted, clinically proven medications*," 2-ER-116 ¶57; 2-ER-154 (emphasis added). While Willow has changed some of the statements on its website since Lilly filed suit, Willow's Home Page still refers to "[p]ersonalized care," and "[c]ustom-formulated compounded medications." Home Page; *see also e.g.*, 2-ER-133 ¶¶111-13; 2-ER-153 (referring to its Tirzepatide Treatment as a

[5] And, of course, the fact that Willow updated the page after Lilly filed this lawsuit to now say that its Treatment provides "better results than Semaglutide" (but *not* say the same thing about Lilly's tirzepatide products), *see* n.4, *supra*, all but concedes that its prior assertions were indeed false and misleading.

"personalized formulation"). The Tirzepatide Page likewise continues to represent that Willow's "Tirzepatide is a personalized GLP-1/GIP treatment, crafted for Willow patients who need a custom formulation," and calls the Tirzepatide Treatment a "personalized blend" that is "compounded with your specific needs in mind." Tirzepatide Page; 2-ER-167-68, 171. It even goes so far as to claim that "[t]his isn't a standard treatment; it's one made just for you." Tirzepatide Page; 2-ER-168.

All of this conveys the undeniable message that the drug inside each of Willow's vials contains a unique blend of ingredients compounded specifically to each patient's individual needs. But there is nothing personalized about Willow's drugs. Willow's customers all receive the exact same compounded blend of tirzepatide with glycine.[6] 2-ER-140 ¶¶127-28. Said differently, everyone gets the same drug from Willow, regardless of individual needs or goals. Neither Willow nor its partner compounding pharmacies compound any (let alone each) dose with a consumer's "specific needs in mind," medical or otherwise; the doses are prepared at scale in large batches well before they are ever sold to a particular consumer.

[6] Inclusion of this additive further reinforces that Willow cannot rely on Lilly's clinical studies or their outcomes, as the safety and effectiveness of those additives were not evaluated in Lilly's studies. *See* n.3, *supra*.

There is no personalization or custom formulation of Willow's drugs; there is just one single formulation and standardized doses.

As discussed in Lilly's FAC and corresponding exhibits, Willow's online "quiz" that urges consumers to "[f]ind out if Willow is right for you" demonstrates Willow's standardized, one-size-fits-all approach. 2-ER-136-40 ¶¶118-30; 2-ER-201-239; 2-ER-240-76. No matter how a potential customer answers the quiz's questions, the quiz responded: "Great news! We think we can help you[.] Based on your answers, you may be a candidate for our treatment plans." 2-ER-210-11, 226-27, 240-276. Further down the page, Willow suggested its Tirzepatide Treatment—generating the same result and giving the same recommendation (for the same Tirzepatide Treatment) every time, regardless of how someone described their needs. That gives lie to any assertion by Willow about personalization or custom tailoring.

Notably, Willow began (mis)characterizing its offerings as "personalized" only after FDA issued an order warning compounders that the shortage of Lilly's tirzepatide medicines had been resolved, *see* pp.13-14, *supra*, which made crystal clear they could not lawfully mass-produce compounded tirzepatide drugs. *See* U.S. Food & Drug Admin., *Resolution of Tirzepatide Injection Product Shortage and Supply Status* (Dec. 19, 2024), https://perma.cc/7MPN-AFE7. Willow's shift may reflect an attempt to feign compliance with 21 U.S.C. §353a's allowance for individualized compounding to meet specific patient needs. *See* p.11-12, *supra*; *see*

*also* 2-ER-188-89. But while Willow has changed its marketing (a bit), it has not changed its "Treatment"—as the FAC makes clear.[7]

***Tirzepatide Drops.*** Finally, Willow has made numerous false and misleading claims regarding "Tirzepatide Drops," an oral drop format of tirzepatide it sold at the time Lilly filed its FAC, touting them as a safe and effective alternative to injectable medications. *See* 2-ER-97 ¶5 n.2; 2-ER-127-30 ¶¶91-100. At the top of the Treatment page, Willow asserted that using the Drops led "to even more effective weight loss treatment without injections." 2-ER-188. Further down the page, Willow advertised that the Drops "work[ed] by placing the drug under the tongue, where it dissolve[d] and [wa]s absorbed directly into the bloodstream through the tissues," and referred to this as a "safe and popular alternative for patients that are uncomfortable with self-injections." 2-ER-191. Willow claimed that the Drops were "custom-prepared for individual patients who c[ould not] use standard formulations or need[ed] a tailored approach." 2-ER-188. And, as with its injectable Treatment, Willow's advertising referenced supposed "[c]linical trials" and "[t]he science behind Tirzepatide Drops." 2-ER-189-90.

[7] In light of FDA's determination that the tirzepatide shortage was over as of October 2024, any mass-compounding since that date lacks even a fig-leaf of legality. *See* pp.11-13, *supra*. Since the date of that determination, Willow competes with Lilly to the extent it (unlawfully) sells mass-compounded products.

Individually and together, these statements gave the distinct impression that Willow's Tirzepatide Drops were clinically tested and proven safe and effective, as well as superior to other weight-loss medicines, including Lilly's FDA-approved tirzepatide products. But Willow never had any clinical studies for its Drops. Indeed, Lilly is unaware of *any* clinical studies demonstrating that *any* oral formulation of tirzepatide is safe and effective for human use, much less that one is superior to Lilly's FDA-approved products. That lack of clinical testing of oral formulations is especially critical to note, because the different ways injectable and oral medicines interact with the human body means that the rate of absorption and bioavailability of those drugs (especially over time) necessarily varies. That often causes an API to behave differently once it enters the body, which in turn can "influence drug effectiveness and safety" as well as "the onset, intensity, and sometimes the duration of action." Abdulrahman A. Alagga et al., *Drug Absorption*, StatPearls Publishing LLC (Feb. 27, 2024), https://perma.cc/4KDW-49J5. In short, by offering its Drops, Willow experimented on consumers for months with an untested and unapproved product while comparing it to Lilly's proven safe and effective medicines.

After Lilly filed this lawsuit, Willow removed all reference to Tirzepatide Drops from its "treatment" page. As far as Lilly can tell, Willow no longer offers them. However, as of the day that this brief was filed, it appears that Willow is once

again selling and promoting an oral version, now dubbed "Tirzepatide Tablets." *See* Home Page.

### C. Procedural Background

To prevent Willow from continuing to propagate deception, Lilly sued Willow in the U.S. District Court for the Central District of California, bringing, as relevant here, a false-advertising claim under the Lanham Act, 15 U.S.C. §1125(a)(1)(B). 3-ER-420 ¶9; 3-ER-447-48 ¶¶108-16. Lilly's complaint highlighted in detail the false and misleading assertions in Willow's advertising. *See* 3-ER-428-44 ¶¶36-86. Lilly also discussed how these deceptive statements harmed Lilly economically and reputationally. 3-ER-444-45 ¶89; 3-ER-447 ¶106 (alleging "monetary damages that can be measured and quantified as well as discernible competitive injury by the loss of goodwill").

Willow filed a motion to dismiss, which the district court granted. 2-ER-277-93. The court began by recognizing that "[i]f the plaintiff can demonstrate that the defendant is a direct competitor, there is a presumption of a commercial injury to plaintiff sufficient to establish [a valid cause of action]," and agreeing that Lilly plausibly pleaded that Willow directly competes with it for customers. 2-ER-282-83 (citing *TrafficSchool*, 653 F.3d at 827). But the court then took a wrong turn. The court held that Lilly "failed to sufficiently allege a commercial injury" sufficient to place it within the Lanham Act's zone of interests because it "failed to plead a single

lost sale." 2-ER-284. The court also held that Lilly "failed to allege proximate cause" because Lilly did not show a "1:1 relationship" between lost sales and Willow's false advertising, and a doctor's prescription breaks any causal chain between Willow's false advertising and lost sales. 2-ER-285. Finally, the court held that Lilly failed to state a false-advertising claim because, in its view, Lilly put forth only "conclusory assumptions" regarding Willow's claims that its drugs were clinically proven to be safe and effective, and Willow's personalization statements were not false. 2-ER-287-92. The court thus dismissed Lilly's initial complaint with leave to amend. 2-ER-293.

Lilly disagreed with that decision, but nonetheless filed an amended complaint. The amended complaint added multiple, concrete allegations showing consumer confusion regarding compounded weight-loss drugs, *see* 2-ER-111-15 ¶¶44-53, and added pages and pages of allegations regarding Willow's false and misleading claims concerning its tirzepatide-based products, *see* 2-ER-115-41 ¶¶54-132. It also discussed at length how consumers are being deceived by Willow's misrepresentations. *See, e.g.*, 2-ER-124 ¶82; 2-ER-126-27 ¶89; 2-ER-129 ¶99; 2-ER-140-41 ¶131. And it added numerous allegations detailing how Willow's deception not only has injured (and continues to injure) Lilly's reputation, but "has caused a diversion of sales and lost profits from Lilly on those sales," *e.g.*, 2-ER-102-03 ¶13; 2-ER-124-25 ¶83; 2-ER-127 ¶90; 2-ER-129-30 ¶100; 2-ER-141 ¶132;

2-ER-141-45 ¶¶133-42; 2-ER-145 ¶145. Lilly sought declaratory, injunctive, and monetary relief. 2-ER-146-48.

Willow again moved to dismiss, and the district court again granted Willow's motion. 1-ER-4-16. This time, the court (ostensibly) limited its analysis to whether Lilly had "statutory standing," *i.e.*, whether Lilly could bring a Lanham Act claim for false advertising against Willow. 1-ER-10. After re-articulating the principle that establishing direct competition creates a presumption of commercial injury sufficient to establish statutory standing, 1-ER-10-11, the court held that Lilly had sufficiently pleaded a commercial injury from lost sales and, therefore, fell within the Lanham Act's zone of interests. 1-ER-11-13. But, as with its order dismissing Lilly's initial complaint, the court went on to hold that Lilly failed to adequately plead "a 1:1 relationship" between its lost sales and Willow's gained sales or a "chain of inferences connecting patient's exposure to advertising with the ultimate purchase of a compounded drug." 1-ER-14. According to the district court, the fact that "obtaining a prescription medication requires a physician to prescribe it" means that Lilly failed to adequately plead proximate causation. 1-ER-14-15.

Although the court's analysis ostensibly was limited to whether Lilly adequately pleaded a Lanham Act cause of action, it then asserted, without explanation or elaboration, that "Lilly cannot establish Article III standing." 1-ER-15. Because of this perceived lack of constitutional standing, the court did not

"proceed with any further analysis of whether the challenged advertisements are actionable." 1-ER-15. The court then dismissed the case with prejudice and without leave to amend. 1-ER-16.

After the district court entered its judgment, 1-ER-2-3, Lilly timely appealed, 3-ER-452-65.

## SUMMARY OF ARGUMENT

The district court erred from top to bottom in granting Willow's motion to dismiss Lilly's FAC. At the outset, Lilly plainly has Article III standing. No analysis accompanied the district court's contrary conclusion "that Lilly cannot establish Article III standing." 1-ER-15. Nor had the court indicated any Article III concerns in its earlier order regarding Lilly's initial complaint. Not even Willow disputed Lilly's Article III standing below—for good reason: Lilly more than plausibly pleaded textbook economic and reputational injuries; those injuries are clearly traceable to Willow's alleged misrepresentations, which have likely confused consumers and caused them to switch from Lilly's FDA-approved tirzepatide products to Willow's knockoffs and to doubt the safety and efficacy of Lilly's medicines; and a favorable decision in this lawsuit will unquestionably redress Lilly's injuries. The district court's drive-by jurisdictional holding cannot stand.

The district court's "statutory standing" holding is no more defensible. This Court has squarely held that "when [a] plaintiff competes directly with [a] defendant,

a misrepresentation will give rise to a presumed commercial injury that is sufficient to establish [statutory] standing." *TrafficSchool*, 653 F.3d at 826-27. And, here, the district court agreed that Lilly plausibly pleaded that Willow is in "direct competition" with it because "Willow's conduct 'results in potential patients being lured away'" from Lilly and "'Willow['s] … materially false statements … influence consumers' … decision to purchase Willow's [drugs] instead of Lilly's FDA-approved medicines.'" 1-ER-13 (alterations in original) (quoting 2-ER-102-03 ¶13; 2-ER-145 ¶145). Under this Court's precedent, then, Lilly plainly has a right to sue Willow for false advertising under the Lanham Act, and Willow's motion to dismiss should have been denied out of hand.

The district court nonetheless held that Lilly lacks "statutory standing" (or, rather, a Lanham Act cause of action) because it failed to meet *Lexmark*'s proximate-cause requirement. But the court's reasoning errs at every turn.

The district court read *Lexmark* to require every Lanham Act false-advertising plaintiff to show a nearly 1:1 relationship between lost and diverted sales. But *Lexmark* never articulated such a requirement, and it certainly did not articulate such a requirement *for competitors*. Furthermore, *Lexmark* is explicit that plaintiffs pleading reputational injury do not have to show competition between themselves and a defendant *at all*, much less a 1:1 showing between lost and diverted sales. And, here, Lilly pleaded a clear chain of inferences connecting Willow's false

advertisements to Lilly's injuries. Lilly highlighted widespread consumer confusion regarding the nature of compounded weight-loss drugs, detailed a host of false and misleading statements on Willow's website, and alleged that these statements were creating confusion with consumers, leading those consumers to switch from Lilly's products to Willow's while also complaining to Lilly when compounded products were not effective or had adverse effects. That is a textbook connection between a defendant's false advertising and a Lanham Act plaintiff's cognizable injuries, and more than sufficient to satisfy proximate cause.

The district court held otherwise only by imposing an unprecedented and unsustainable rule that the need to obtain a prescription from a physician breaks the proximate-cause chain in all false-advertising cases involving prescription drugs. The problems with that novel rule are legion. *Lexmark* held in no uncertain terms that Lanham Act false-advertising plaintiffs can properly plead proximate cause even when there are multiple intermediating links between the defendant's misconduct and the plaintiff's injuries, and especially when there are no more immediate victims of the defendant's misconduct. That is the case here. When consumers are told that Willow's products are equivalent or superior to Lilly's, they can be swayed in Willow's direction. And when Willow's products cause consumers adverse results, Willow's conflation of its compounded tirzepatide-based products with Lilly's FDA-approved tirzepatide products tends to cause consumers to blame Lilly. There is thus

a direct line between Willow's false advertising and Lilly's injuries. Indeed, if Lilly cannot sue under the Lanham Act for the commercial injuries Willow has caused, then no one can.

The decision below effectively immunizes hucksters who sell potentially dangerous knockoff pharmaceuticals from Lanham Act false-advertising liability. This Court should reverse.

## STANDARD OF REVIEW

The district court dismissed Lilly's FAC after indicating in its order that Lilly could not establish a Lanham Act claim and did not have Article III standing. *See* 1-ER-15-16. This Court reviews both determinations de novo, "accept[ing Lilly's] allegations as true and constru[ing] them in the light most favorable to [Lilly]." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (failure to state a claim); *Colwell v. HHS*, 558 F.3d 1112, 1121 (9th Cir. 2009) (standing).

## ARGUMENT

### I. Lilly Has Article III Standing.

To establish Article III standing, a plaintiff must show an "injury in fact" that is "fairly … trace[able]" to the defendant's challenged conduct and likely to be "redressed by a favorable judicial decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). "[E]ach element must be supported … with the manner and degree of evidence required at the successive stages of the litigation," meaning that plausible allegations of injury owing to the alleged misconduct suffice at the motion-

to-dismiss stage. *Id.* at 561; *see Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 987 (9th Cir. 2023) ("When deciding standing at the pleading stage, and for purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."). Under that familiar rubric, Lilly plainly has Article III standing.

First and foremost, Lilly pleaded injury in fact. This Court has repeatedly recognized that, "[i]n a false advertising suit, a plaintiff establishes Article III injury if some consumers who bought the defendant's product under a mistaken belief fostered by the defendant would have otherwise bought the plaintiff's product." *Vericool World, LLC v. Igloo Prods. Corp.*, 175 F.4th 1045, 1051 (9th Cir. 2026); *accord, e.g.*, *TrafficSchool*, 653 F.3d at 825. Lilly pleaded precisely that: "Willow's false advertising has caused a diversion of sales and lost profits from Lilly on those sales." 2-ER-124-25 ¶83; *see also* 2-ER-144-45 ¶¶141-42 (detailing the resulting lost sales). Lilly further alleged that Willow is damaging Lilly's "goodwill, reputation, and standing with the consuming public" by causing consumers to mistake Willow's less-safe and less-reliable knockoffs for Lilly's products. 2-ER-124-25 ¶83; *see also* 2-ER-142-44 ¶¶135-40 (detailing the resulting reputational harms). That, too, constitutes concrete injury sufficient for Article III. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) (listing "reputational harms"

as prototypical "concrete" "intangible harms" that satisfy Article III); *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1117 (9th Cir. 2022) (deeming alleged injuries to the plaintiffs' "business, revenue, goodwill, employee relations, and reputation in the marketplace" sufficient for Article III).

Lilly's injuries are also fairly traceable to Willow's misconduct. "[A]n injury is fairly traceable to a challenged action as long as the links in the proffered chain of causation are not hypothetical or tenuous and remain plausible." *Idaho Conservation League v. Bonneville Power Admin.*, 83 F.4th 1182, 1188 (9th Cir. 2023). "This standard is 'less demanding than proximate causation,'" *id.* (quoting *O'Handley v. Weber*, 62 F.4th 1145, 1161 (9th Cir. 2023)); it requires only "a 'line of causation' between defendants' action and [plaintiff's] alleged harm that is more than 'attenuated,'" *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011). There is nothing hypothetical about the connection between Willow's false advertising and Lilly's injuries. Lilly has plausibly alleged that "Willow's advertising" causes consumers to be "deceived as to the safety and effectiveness of [Willow's] untested, unapproved compounded drugs." 2-ER-111 ¶44. For example, Willow has asserted that using its Tirzepatide Drops leads to "even more effective weight loss treatment without injections." 2-ER-127-28 ¶93. Willow has also described its injectable Tirzepatide Treatment as "a 'premium treatment' containing a 'personalized blend' of ingredients." 2-ER-132 ¶108. Lilly has plausibly alleged

that those statements are false, and that those (and other) false statements "necessarily communicat[e] to patients that [Willow's compounded products] are somehow better than Lilly's FDA-approved medicines," 2-ER-127-28 ¶93 (emphasis removed), which naturally "results in potential patients being lured away from Lilly's safe and effective FDA-approved medicines under false pretenses," 2-ER-102-03 ¶13; *see also* 2-ER-111-15 ¶¶45-53 (discussing surveys, studies, and FDA warnings showing consumer confusion); 2-ER-111 ¶44; 2-ER-143 ¶¶138-39. Lilly's injuries are fairly traceable to Willow's false advertising.

Finally, Lilly's economic and reputational injuries would likely be redressed by a favorable decision on its Lanham Act claims. Lilly could receive monetary relief to help offset the profits it lost as a result of Willow's deceptions or to ensure that Willow cannot keep its ill-gotten gains. And if Willow were forced to be honest about its products, Lilly's customers would not be lured away by deceptive messages; they would likely purchase Lilly's FDA-approved tirzepatide products instead; and they would stop blaming Lilly when compounded tirzepatide products are ineffective or cause adverse results. *See* 2-ER-143-44 ¶¶138-40. This would alleviate the economic and reputational harms caused by Willow's unlawful conduct.

In short, Lilly has leveled plausible "allegations of lost sales and damage to its business reputation" as a result of Willow's false advertising, which suffices to "give it standing under Article III to press its false-advertising claim." *Lexmark*, 572

U.S. at 125; *see also SmileDirectClub*, 31 F.4th at 1117. This Court should reverse the district court's unexplained and inexplicable contrary holding.

## II. Lilly Has A Cause Of Action.

In addition to satisfying Article III's standing requirements, a plaintiff seeking relief in federal court "must have a cause of action under the applicable statute." *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016); *see Lexmark*, 572 U.S. at 131-32. The Lanham Act provides an express cause of action, 15 U.S.C. §1125(a), that "allows one competitor to sue another if it alleges unfair competition arising from false or misleading product descriptions." *POM Wonderful*, 573 U.S. at 106. "[T]o come within the zone of interests in a suit for false advertising under §1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales." *Lexmark*, 572 U.S. at 131-32; *see also POM Wonderful*, 573 U.S. at 109.

In addition to alleging "an injury to a commercial interest in reputation or sales," a Lanham Act false-advertising plaintiff's "alleged harm" must not be "'too remote' from the defendant's unlawful conduct," lest the Lanham Act's proximate-cause limitation foreclose relief. *Lexmark*, 572 U.S. at 132-33. But because "all commercial injuries from false advertising are derivative of those suffered by consumers who are deceived by the advertising," *id.* at 133, "the false-advertising provisions of the Lanham Act" necessarily "permit[] proximate cause to extend

beyond the first step," *City of Oakland v. Wells Fargo & Co.*, 14 F.4th 1030, 1037 (9th Cir. 2021) (en banc). As a result, while a plaintiff "generally" will be unable to sue for false advertising under the Lanham Act "when the deception produces injuries to a fellow commercial actor that in turn affect the plaintiff" only indirectly, a plaintiff satisfies "the proximate-cause requirement" when the "deception of consumers causes them to withhold trade from the plaintiff." *Lexmark*, 572 U.S. at 133-34.

Under that settled law, this should have been an easy case. Lilly has amply pleaded that Willow's advertising "results in potential patients being lured away from Lilly's safe and effective FDA-approved tirzepatide products under false pretenses," which not only directly harms Lilly's bottom line, but directly harms Lilly's reputation too, as hoodwinked consumers blame Lilly when they experience "negative results" from using compounded tirzepatide-based products rather than the genuine articles. 2-ER-102-03 ¶13; 2-ER-111 ¶44; 2-ER-143 ¶¶138-39; *see* 1-ER-13. In other words, Lilly has plausibly alleged that Willow's "deception of consumers"—making them think that Willow's knockoffs are equivalent or superior to Lilly's FDA-approved tirzepatide products—"causes them to withhold trade from [Lilly]" and buy from Willow instead. *Lexmark*, 572 U.S. at 133-34. That is exactly the sort of competitive injury the Lanham Act serves to protect. *See id.* at 131-32 ("[T]o come within the zone of interests in a suit for false advertising under

§1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales.").

It is difficult to imagine a more straightforward case. The district court nonetheless held that Lilly "failed to sufficiently allege both a commercial injury and proximate cause." 1-ER-15. That conclusion is wrong at every level.

### A. The Fact That Willow Competes for Lilly's Customers Suffices to Allow Lilly to Sue Under §1125(a)(1).

As the Supreme Court explained in *Lexmark*, "the 'classic Lanham Act false-advertising claim'" is one "in which 'one competito[r] directly injur[es] another by making false statements about his own goods [or the competitor's goods] and thus inducing customers to switch." 572 U.S. at 137. And as the Supreme Court explained in *POM Wonderful*, "[Section] 43 of the Lanham Act" (*i.e.*, 15 U.S.C. §1125(a)) "allows one competitor to sue another if it alleges unfair competition arising from false or misleading product descriptions." 573 U.S. at 106. Consistent with that understanding, this Court has long held that "when [a] plaintiff competes directly with [a] defendant, a misrepresentation will give rise to a presumed commercial injury that is sufficient" to provide a valid cause of action and defeat a motion to dismiss for lack of so-called 'statutory standing.'[8] *TrafficSchool*, 653 F.3d

[8] While *TrafficSchool* framed this inquiry as one regarding "statutory standing," 653 F.3d at 826, the Supreme Court has since clarified that that label "is misleading, since 'the absence of a valid (as opposed to arguable) cause of action does not implicate … the court's statutory or constitutional *power* to adjudicate the case,'"

at 826; *accord, e.g.*, *ThermoLife Int'l, LLC v. Compound Sols., Inc.*, 848 F.App'x 706, 709 (9th Cir. 2021) ("[A]llegations of product misrepresentation and direct competition suffice to bring suit under the Lanham Act.").

Under this precedent, Willow's argument that Lilly lacks a cause of action (or "statutory standing") under the Lanham Act should have been rejected out of hand. Lilly sells tirzepatide-based products; Willow sells knockoffs of those tirzepatide-based products. *E.g.*, 2-ER-97 ¶¶3-4; 2-ER-124-25 ¶83; 2-ER-127 ¶90; 2-ER-129-30 ¶100; 2-ER-141-42 ¶¶132-33; 2-ER-41, 44. This means Lilly and Willow are direct competitors under the Lanham Act—as the district court correctly found (twice), *see* 2-ER-283; 1-ER-11-13. And Willow's misrepresentations about these products unquestionably "implicate[]" Lilly, *see Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 119 (2d Cir. 2023) ("[I]f Plaintiffs are in direct competition with Defendants, and if Defendants' false advertising implicated Plaintiffs in some way, then injury and proximate cause are presumed."), by luring potential (or past) customers away from Lilly's FDA-approved tirzepatide products to Willow's knockoff tirzepatide products and causing consumers of Willow's compounded products to misattribute negative effects to Lilly's safe and effective products, *see* 2-

---

*Lexmark*, 572 U.S. at 128 n.4 (quoting *Verizon Md. Inc. v. Public Serv. Comm'n*, 535 U.S. 635, 642-43 (2002)). Asking whether a plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue" is not a question of standing, but of whether the plaintiff "has a cause of action." *Id.* at 128.

ER-124-25 ¶83; 2-ER-127 ¶90; 2-ER-129-30 ¶100; 2-ER-141-45 ¶132-42. Indeed, *any* comparison Willow makes necessarily implicates Lilly, given that only Lilly has received FDA approval to market tirzepatide-based medicines. Thus, Lilly has pleaded the "paradigmatic" false-advertising claim, *Lexmark*, 572 U.S. at 138, which is "sufficient to establish [statutory] standing" (or, rather, have a cause of action) under the Lanham Act, *TrafficSchool*, 653 F.3d at 827.

To be clear, moreover, *TrafficSchool*'s holding that "when plaintiff competes directly with defendant, a misrepresentation will give rise to a presumed commercial injury that is sufficient to establish [statutory] standing," *id.*, was not limited to the zone-of-interests inquiry. Its reasoning "fits within the Supreme Court's articulation of the proximate causation test" as well. *Eli Lilly & Co. v. Mochi Health Corp.*, 2026 WL 1076831, at *10 (N.D. Cal. Apr. 20, 2026); *see ThermoLife*, 848 F.App'x at 709 (describing *TrafficSchool*'s holding as encompassing both requirements); *cf. Souza*, 68 F.4th at 119 (Second Circuit holding likewise). That makes sense. "Proximate cause 'bars suits for alleged harm that is "too remote" from the defendant's unlawful conduct.'" *Ray Charles Found. v. Robinson*, 795 F.3d 1109, 1123-24 (9th Cir. 2015) (quoting *Lexmark*, 572 U.S. at 133). But there is nothing "remote" about the economic injuries Competitor *A* suffers when Competitor *B* misleads the pool of consumers over which the two parties compete into thinking that *B*'s products are superior to *A*'s and buying *B*'s products instead of *A*'s. Nor is there anything

"remote" about the reputational harms *A* suffers when *B* misleads their shared consumer base into thinking that *B*'s inferior knockoffs *are A*'s genuine articles. For both types of harm, the injury flows directly from the misrepresentation.

Under a straightforward application of this Court's precedent, then, Lilly has a cause of action against (or "statutory standing" to sue) Willow for false advertising under the Lanham Act. This Court can and should reverse on that basis alone.

### B. Even Without the *TrafficSchool* Presumption, Lilly Pleaded a Valid Lanham Act Cause of Action.

#### 1. Lilly is clearly within the Lanham Act's zone of interests.

The Supreme Court has left no doubt about how the zone-of-interests analysis works for purposes of the Lanham Act's false-advertising provisions. "[T]o come within the zone of interests in a suit for false advertising under §1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales." *Lexmark*, 572 U.S. at 131-32; *see also Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*, 165 F.Supp.3d 937, 946 (S.D. Cal. 2016) ("In the false advertising context, Congress' goal was to protect persons engaged in commerce against unfair competition.").

Under that standard, there can be no serious dispute that Lilly's suit comes within the Act's zone of interests. As the district court correctly recognized, Lilly sufficiently pleaded the paradigmatic false-advertising injury, alleging that "Willow['s] … materially false statements … influence consumers' … decision to purchase Willow's [drugs] instead of Lilly's FDA-approved medicines." 1-ER-13

(alterations in original) (quoting 2-ER-102-03 ¶13; 2-ER-145 ¶145); *see also, e.g.*, 2-ER-124-25 ¶83; 2-ER-127 ¶90; 2-ER-129-30 ¶100; 2-ER-141 ¶132; 2-ER-144-45 ¶¶141-42. In other words, Lilly plausibly pleaded that Willow's false and misleading advertising has diverted (and is diverting) sales from Lilly to Willow. This puts Lilly squarely within the Lanham Act's zone of interests—as the district court (twice) concluded, 1-ER-13-14; 2-ER-283-84, and Willow all but conceded, *see* 3-ER-322-23 (28:23-29:2; 29:14-19). *See also ThermoLife*, 848 F.App'x at 709 ("ThermoLife's injury comes within the Lanham Act's zone-of-interests because ThermoLife alleges that customers are choosing [the defendant's product] over ThermoLife's [], which is a commercial injury to sales.").

Lilly sufficiently pleaded reputational harm as well. *See, e.g.,* 2-ER-124-25 ¶83; 2-ER-127 ¶90; 2-ER-129-30 ¶100; 2-ER-141 ¶132; 2-ER-142-44 ¶¶134-40. As the Supreme Court explained in *Lexmark*, reputational harm is cognizable for a Lanham Act false-advertising claim where "the defendant damages [a] product's reputation by, for example, equating it with an inferior product." 572 U.S. at 138. Lilly specifically explained in the FAC how Willow's false advertisements create an association in the minds of consumers between Lilly's Mounjaro® and Zepbound® on the one hand and Willow's knockoffs on the other. Willow misleadingly compares its knockoffs to Lilly's tirzepatide products, and has even gone so far as to claim that it provided "better results than Tirzepatide," 2-ER-125-26 ¶¶85-86; 2-ER-

132 ¶108—by which it means "better results than" *Lilly's* Mounjaro® and Zepbound®, the only FDA-approved tirzepatide products on the market.

Given those direct (but false and misleading) comparisons, it is unsurprising that consumers have contacted Lilly to report adverse events after taking compounded products, without realizing they had been using compounded tirzepatide rather than Lilly's actual products. 2-ER-143-44 ¶¶138-40. All this harms Lilly's reputation, leading consumers to think that Lilly's medicines are unsafe, ineffective, or inferior due to their confused association of Lilly's (FDA-approved and extensively tested) medicines with Willow's (unapproved, untested, and potentially unsafe) products. *See Vericool*, 175 F.4th at 1055 ("A misrepresentation about attributes embodied in a physical product is actionable under the Lanham Act if it misleads a consumer about the quality of a good itself[.]").

In short, "[t]here is no doubt that [Lilly] is within the zone of interests protected by the [Lanham Act]." *Lexmark*, 572 U.S. at 137.

#### 2. Willow's misrepresentations proximately caused Lilly's injuries.

Nor is there any doubt that Lilly sufficiently pleaded proximate causation. Under *Lexmark*, a plaintiff satisfies the Lanham Act's proximate-cause requirement by showing that a defendant's misrepresentations have led consumers "to withhold trade from the plaintiff." *Id.* at 133. The Supreme Court was explicit on this point,

"hold[ing] that a plaintiff suing under §1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; *and that that occurs when deception of consumers causes them to withhold trade from the plaintiff*." *Id.* (emphasis added).

Lilly more than plausibly alleged precisely that. Lilly highlighted in its FAC that consumers are confused "as to the nature of compounded GLP-1s," including tirzepatide-based medicines specifically, and that "consumer misperceptions are fed and exacerbated by widespread false advertising by companies that promote compounded GLP-1 drugs like Willow." 2-ER-111-15 ¶¶44-53. Lilly discussed in detail the false and misleading statements on Willow's website regarding Willow's tirzepatide-based knockoffs. *See* 2-ER-115-41 ¶¶54-132. Lilly pleaded that (and explained in detail how) Willow's false advertising has caused and is leading customers to be "lured away from Lilly's safe and effective FDA-approved medicines under false pretenses," which causes "competitive injury" to Lilly in the form of lost sales and reputational harm. 2-ER-102-03 ¶13; *see also* 2-ER-145 ¶145; 2-ER-146 ¶149. And, for good measure, Lilly explained that price is likely not a relevant factor in consumers' decisionmaking here, because Lilly's and Willow's products are offered "at similar prices"; indeed, Zepbound® is even less expensive than Willow's knockoffs. 2-ER-144-45 ¶142.

This is thus the "classic Lanham Act false-advertising claim," as Willow "directly injur[es]" Lilly "by making false statements about [its] own goods … thus inducing customers to switch." *Lexmark*, 572 U.S. at 137. "In addition, [Lilly] has alleged facts indicating that consumers have purchased [Willow's] compound drug under the mistaken belief that it was either [Lilly's] product or an identical product." *Novo Nordisk A/S v. Ikon Health LLC*, 2026 WL 196475, at *3 (E.D. Wash. Jan. 26, 2026); *see* 2-ER-143 ¶¶138-39. "Given th[ese] allegation[s], [Lilly] has made a plausible showing that [Willow's] marketing behavior has cut into its share of the market—at least the share of the market for consumers who want a … weight-loss product that had been subject to FDA scrutiny." *Novo*, 2026 WL 196475, at *3 (so holding as to Novo's similar claims). And because Willow's advertisements are designed to divert customers away from Lilly, there are no "more immediate victim[s]" of Willow's unlawful conduct. *Lexmark*, 572 U.S. at 140 (alteration in original). In short, Lilly "satisfied the proximate-cause requirement because [it] sufficiently allege[d] that its [tirzepatide products] directly compete with [Willow's] falsely advertised [tirzepatide products]," *ThermoLife*, 848 F.App'x at 709, and Willow's false advertising has both diverted business away from Lilly and harmed Lilly's reputation with customers, *see Lexmark*, 572 U.S. at 133.

The district court rejected this straightforward conclusion, but its reasoning cannot withstand scrutiny.

***A "1:1 relationship" between diverted and lost sales is not required.*** Invoking *Lexmark*, the district court first faulted Lilly for lacking "allegations showing a 1:1 relationship, or anything approaching it, between lost sales and sales diverted to Willow." 1-ER-14. But neither *Lexmark* nor any other case imposes any such requirement—and especially not when (as here) the defendant's advertising by its plain terms seeks to divert customers away from the plaintiff.

The Court in *Lexmark* held that the plaintiff, Static Control, "satisf[ied] the requirement of proximate causation" for two independent reasons. 572 U.S. at 138. "First, Static Control alleged that Lexmark disparaged its business and products[.]" *Id.* That allegation sufficed to connect Lexmark's alleged misrepresentations "directly" to the alleged injury to Static Control's "reputation[]," and therefore sufficed for proximate cause. *Id.* The same is true here. As explained, Lilly sufficiently pleaded that Willow's advertising has undermined Lilly's reputation with consumers by leading them to mistakenly attribute to Lilly problems with Willow's inferior knockoffs. *See* 2-ER-124-25 ¶83; 2-ER-127 ¶90; 2-ER-129-30 ¶100; 2-ER-141 ¶132; 2-ER-142-44 ¶¶135-40.

That is all Lilly needed to plead to establish proximate cause. *Lexmark* was clear on this point: "When a defendant harms a plaintiff's reputation" "by, for example, equating [the plaintiff's products] with an inferior product," "[t]raditional

proximate-causation principles" instruct that "the plaintiff's injury flows directly from the audience's belief in the [misleading] statements." 572 U.S. at 138.

Indeed, this case is even easier than *Lexmark*, where the plaintiff and defendant were "not direct competitors" and the defendant (Lexmark) said nothing about Static Control's actual products (microchips). *Id.* Lexmark allegedly disparaged refurbished printer cartridges, and Static Control was a component manufacturer that sold microchips that were necessary for, and had no other use than, the refurbished printer cartridges. *See id.* at 120-23, 139. Yet even though Lexmark and Static Control did not compete with one another, that did not change the Court's proximate-cause analysis with respect to Static Control's asserted reputational harm. As the Court explained, "when a party claims reputational injury from disparagement, competition is not required for proximate cause." *Id.* at 138.

That makes this case easy. Even the district court agreed that the parties here are competing for the same customers (because of Willow's mass-compounding), *see* 1-ER-11-13, and no one could deny that Willow has favorably (but falsely and misleadingly) compared its products to Lilly's products, *see, e.g.*, 2-ER-167. In this context, then, neither law nor logic supports the district court's holding that only a strict 1:1 diverted-sales ratio will satisfy proximate cause. Again, *Lexmark* held that a Lanham Act plaintiff alleging "reputational injury" can satisfy "proximate cause" even if "the plaintiff merely suffered collateral damage" from the defendant's false

statements. 572 U.S. at 138. And, here, the whole point of Willow's false advertising was (and is) "to divert sales from" Lilly. *See id.* at 138-39. The district court's conclusion that proximate cause is lacking here thus effectively under-rules *Lexmark*.

That is not the only problem with the district court's "1:1" holding. "In addition" to concluding that Static Control's reputational allegations sufficed for purposes of proximate cause, *Lexmark* held that "'there c[ould] be no question' that proximate cause [wa]s satisfied," as "there [was] likely to be something very close to a 1:1 relationship between the number of refurbished Prebate cartridges sold (or not sold) by the remanufacturers and the number of Prebate microchips sold (or not sold) by Static Control." *Id.* at 139. That was an independent, alternative holding. Thus, as the Sixth Circuit has expressly recognized, "[w]hile *Lexmark* itself involved an alleged 1:1 ratio between sales gained by the defendant and sales lost by the plaintiff, it does not hold that §1125(a) requires such a ratio in order to establish causation." *Campfield v. Safelite Grp., Inc.*, 91 F.4th 401, 413 (6th Cir. 2024).

Nor would it make sense to extract such a hard-and-fast rule from *Lexmark*. As just explained, the plaintiff and defendant in *Lexmark* did not compete with one another. Perhaps it makes sense in that sort of *indirect* context to require something approaching a 1:1 relationship between lost sales by the plaintiff and sales diverted to the defendant; after all, "a plaintiff who does not compete with the defendant will

often have a harder time establishing proximate causation." *Lexmark*, 572 U.S. at 136; *see Muhler Co. v. Ply Gem Holdings, Inc.*, 637 F.App'x 746, 747-48 (4th Cir. 2016) (per curiam) (explaining that "the roughly '1:1 relationship' between the sales of Lexmark's product and lost sales of Static Control's component part … distinguish[ed] *Lexmark* from the typical case brought by an indirect victim"). But it makes no sense to require such a showing when, as here, the defendant promotes its product by making direct (but false and misleading) comparisons with the plaintiff's products. That likely explains why this Court has long rejected the notion that Lanham Act plaintiffs must prove "as a prerequisite to bringing suit" that the "defendant's ads caused [them] to lose sales." *TrafficSchool*, 653 F.3d at 827; *see also Souza*, 68 F.4th at 119 (Second Circuit reaffirming post-*Lexmark* that "a direct competitor's 'false comparative advertising claim'" suffices to permit a Lanham Act false-advertising plaintiff to pursue its claims); *Vicious Brands, Inc. v. Face Co., LLC*, 2026 WL 276178, at *9 (N.D. Cal. Feb. 3, 2026) (explaining that requiring such a "1:1" showing even for competitors "would seem to preclude most if not all Lanham Act false advertising claims in typical markets with multiple competitors").

***Prescription-drug-related advertising is not exempt from the Lanham Act.*** That errant "1:1" holding aside, the district court's lack-of-proximate-cause conclusion ultimately turned on the fact that the products at issue in this case are prescription drugs. According to the district court, because "obtaining a prescription

medication requires a physician to prescribe it," and all tirzepatide-based products require a prescription, Lilly failed to establish a "chain of inferences connecting a patient's exposure to [Willow's] advertising with the ultimate purchase of a compounded drug." 1-ER-14-15. That theory, which essentially exempts prescription-drug-related advertising from the Lanham Act, is wrong.

Start with first principles. Proximate cause exists to "limit a person's responsibility for the consequences of that person's own acts." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). "A requirement of proximate cause" thus serves "to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *Paroline v. United States*, 572 U.S. 434, 445 (2014). "For this reason, '[p]roximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct.'" *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 951 (9th Cir. 2014) (alteration in original) (quoting *Paroline*, 572 U.S. at 445).

There is nothing unforeseeable about Willow's false advertising driving consumers away from Lilly's tirzepatide-based medicines and toward Willow's knockoffs. Indeed, that is the whole point: Willow wants consumers to think that its compounded tirzepatide products are the same as (or even superior to) Lilly's FDA-approved tirzepatide products so they will buy from Willow rather than from

Lilly. That is why Willow has advertised that its Tirzepatide Treatment contains the "[s]ame active ingredient as Mounjaro® & Zepbound®," 2-ER-132 ¶108 (emphasis removed), branded its Tirzepatide Treatment as its "premium treatment," 2-ER-167, and claimed that each batch of its Treatment "undergoes extensive testing," 2-ER-167, even though the only "testing" of tirzepatide is the testing to which *Lilly* has subjected *Lilly*'s products. It is also why Willow goes so far as to claim (falsely) that what Willow offers "isn't a standard treatment; it's one made just for you." Tirzepatide Page; 2-ER-167-68; 2-ER-171; *see also* 2-ER-181-86. Given the facts alleged in the FAC, it takes scant metal to weld the chain of inferences together: Customers see Willow's advertising, they think Willow's products are the same as or superior to Lilly's, and then they want to buy from Willow instead of Lilly.

The chain of inferences leading to reputational harm is only one step longer. Given Willow's intentional conflation of its compounded products with Lilly's FDA-approved products, consumers who experience negative results from Willow's Tirzepatide Treatment likely attribute those results to the ineffectiveness (or unsafety) of tirzepatide generally or Lilly's tirzepatide products specifically. *See* 2-ER-143 ¶138. There is nothing speculative about this connection. "In fact, consumers have contacted Lilly to report adverse events from taking compounded products," including "trips to the emergency room and hospitalization"; and "[i]n multiple such cases, consumers … were not aware they had been taking compounded

tirzepatide," and instead thought they were taking Lilly's products. 2-ER-143 ¶139. That is more than sufficient to establish proximate cause. *See, e.g.*, *ThermoLife*, 848 F.App'x at 709 (proximate cause satisfied where "some of [plaintiff's] customers have considered replacing and have replaced [its product] with [defendant's]").

Nor is there any question that Lilly's injuries are within "the scope of the risk" created by Willow's misrepresentations, *see Paroline*, 572 U.S. at 445—or, to use the language of *Lexmark*, that "the harm [Lilly] allege[s] has a sufficiently close connection to the conduct the statute prohibits," 572 U.S. at 133. The fundamental "purpose" of the Lanham Act's false-advertising prohibition is "protect[ing] persons engaged in [commerce within the control of Congress] against unfair competition." *POM Wonderful*, 573 U.S. at 108 (alterations in original). And while those provisions may ultimately serve to protect consumers, "the Lanham Act authorizes suit only for commercial injuries." *Lexmark*, 572 U.S. at 133. The *sine qua non* harms caused by a violation of the Act's false-advertising provisions are thus lost sales and reputational damage caused by a defendant's misrepresentations about its or the plaintiff's products. *Id.* at 131-32. That, after all, is why *Lexmark* held that a plaintiff satisfies proximate cause by showing that the defendant's "deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 133.

Given all that, it should come as no surprise that "[c]ourts have routinely found that Lanham Act claims can be maintained for prescription drugs, where the

prescriber is the gatekeeper for the product." *Eli Lilly & Co. v. Adonis Health, Inc.*, 2025 WL 2721684, at *4 (N.D. Cal. Sept. 24, 2025); *accord Mochi Health*, 2026 WL 1076831, at *10-12; *Eli Lilly & Co. v. Aios, Inc.*, 2026 WL 836624, at *5-6 (N.D. Cal. Mar. 26, 2026); *see also, e.g.*, *Allergan USA Inc. v. Imprimis Pharms., Inc.*, 2017 WL 10526121, at *1-2, 6 (C.D. Cal. Nov. 14, 2017) (proximate cause satisfied where both drugs at issue were available only by prescription); *Scilex Pharms. Inc. v. Sanofi-Aventis U.S. LLC*, 2021 WL 11593043, at *1, 6 (N.D. Cal. Aug. 16, 2021) (proximate cause satisfied where one product was available only with a prescription and the other over the counter). The district court did not reckon with any of these decisions; nor did it cite any case supporting its novel theory that prescribing decisions automatically break the causal chain in this context. The decision below is thus not only unsustainable, but unprecedented.

In fact, *this Court* has squarely rejected the proposition "that prescribing physicians" necessarily "constitute intervening causes that sever the chain of proximate cause." *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*, 943 F.3d 1243, 1257 (9th Cir. 2019). As this Court explained, "since [the product at issue there] was a *prescription* drug, it was *required* to be prescribed by physicians. Hence, it was perfectly foreseeable that physicians who prescribed [that product] would play a causative role in Defendants' alleged fraudulent scheme to increase [the drug's] revenues." *Id.* Nevertheless, the Court

held that the need for a prescription did not suffice to break the causal chain. *Id.* at 1257-58. Lilly is one of the defendants in that case (*Painters*), which remains ongoing, and it obviously disagrees with that decision. But *Painters* is the law of this Circuit—and, under it, this case should follow *a fortiori*. "Proximate-cause analysis is controlled by the nature of the statutory cause of action. The question it presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Lexmark*, 572 U.S. at 133. And whereas "'[t]he general tendency of the law … not to go beyond the first step' … applies with full force to proximate cause inquiries under RICO," *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 10 (2010) (first alteration in original) (quoting *Holmes*, 503 U.S. at 271-72), the statute at issue in *Painters*, this statute is quite different. As this Court has squarely held, "the false-advertising provisions of the Lanham Act" "permit[] proximate cause to extend beyond the first step." *City of Oakland*, 14 F.4th at 1037.

Indeed, *Lexmark* itself held that proximate cause was satisfied even though the causal chain there extended beyond the *second* step to a plaintiff that did not actually compete with the defendant, even though a direct competitor there was fully capable of suing itself. *See* 572 U.S. at 138-40. Here, by contrast, no one other than Lilly could challenge Willow's false advertising under the Lanham Act. After all, physicians do not compete with Willow or suffer commercial injuries when they prescribe drugs for consumers via Willow, and consumers cannot bring false-

advertising suits under the Lanham Act at all. *See POM Wonderful*, 573 U.S. at 106-09. There is thus no "discontinuity" requiring "speculative … proceedings" or "intricate, uncertain inquiries" to determine whether Willow caused Lilly's injuries. *Lexmark*, 572 U.S. at 140. Willow told consumers that its knockoffs were the same as (or even better than) Lilly's FDA-approved products, driving consumers to buy from Willow instead of Lilly. The Lanham Act exists to prevent commercial actors from engaging in that sort of bad-faith advertising. If the decision below stands, however, not only will Lilly be left without a remedy under the Lanham Act for the harms Willow has caused—no one will be able to do anything about it.[9]

[9] That point has not been lost on Willow. Willow initially responded to Lilly's lawsuit by ceasing the sale and promotion of an oral tirzepatide product, dubbed Tirzepatide Drops (likely because, as explained above, FDA *has not approved any oral tirzepatide product*). *See* pp.21-23, *supra*. But Willow now appears to have responded to the district court's opinion in this case by reverting back to selling an oral tirzepatide product—and promoting that product by making a bevy of additional false and misleading claims. If the decision below stands, then all of those false and misleading statements (and all similar statements by other compounders) will be wholly immune from Lanham Act liability. That cannot be the law.

## CONCLUSION

For the reasons set forth above, this Court should reverse.

Respectfully submitted,

s/Matthew D. Rowen
ERIN E. MURPHY
MATTHEW D. ROWEN
*Counsel of Record*
KYLE R. EISWALD
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
matthew.rowen@clementmurphy.com

*Counsel for Appellant*

July 24, 2026

## STATEMENT OF RELATED CASES

Eli Lilly and Company is unaware of any cases that are related within the meaning of Circuit Rule 28-2.6.

July 24, 2026

s/Matthew D. Rowen
Matthew D. Rowen

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Circuit Rule 32-1 because this brief contains 11,825 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

July 24, 2026

s/Matthew D. Rowen
Matthew D. Rowen

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system. I certify that all participants in this case are registered ACMS users and that service will be accomplished by the ACMS system.

s/Matthew D. Rowen
Matthew D. Rowen

# STATUTORY ADDENDUM

**TABLE OF CONTENTS**

15 U.S.C. §1125 .......................................................................................... Add.1

United States Code Annotated
Title 15. Commerce and Trade
Chapter 22. Trademarks (Refs & Annos)
Subchapter III. General Provisions

15 U.S.C.A. § 1125

§ 1125. False designations of origin, false descriptions, and dilution forbidden [Statutory Text & Notes of Decisions subdivisions I to III]

Effective: October 5, 2012
Currentness

<Notes of Decisions for 15 USCA § 1125 are displayed in multiple documents.>

**(a) Civil action**

**(1)** Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

**(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

**(B)** in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

**(2)** As used in this subsection, the term "any person" includes any State, instrumentality of a State or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

**(3)** In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional.

**(b) Importation**

Any goods marked or labeled in contravention of the provisions of this section shall not be imported into the United States or admitted to entry at any customhouse of the United States. The owner, importer, or consignee of goods refused entry at any


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

customhouse under this section may have any recourse by protest or appeal that is given under the customs revenue laws or may have the remedy given by this chapter in cases involving goods refused entry or seized.

**(c) Dilution by blurring; dilution by tarnishment**

**(1) Injunctive relief**

Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

**(2) Definitions**

**(A)** For purposes of paragraph (1), a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:

**(i)** The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

**(ii)** The amount, volume, and geographic extent of sales of goods or services offered under the mark.

**(iii)** The extent of actual recognition of the mark.

**(iv)** Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

**(B)** For purposes of paragraph (1), "dilution by blurring" is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark. In determining whether a mark or trade name is likely to cause dilution by blurring, the court may consider all relevant factors, including the following:

**(i)** The degree of similarity between the mark or trade name and the famous mark.

**(ii)** The degree of inherent or acquired distinctiveness of the famous mark.

**(iii)** The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

**(iv)** The degree of recognition of the famous mark.



WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**(v)** Whether the user of the mark or trade name intended to create an association with the famous mark.

**(vi)** Any actual association between the mark or trade name and the famous mark.

**(C)** For purposes of paragraph (1), "dilution by tarnishment" is association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark.

**(3) Exclusions**

The following shall not be actionable as dilution by blurring or dilution by tarnishment under this subsection:

**(A)** Any fair use, including a nominative or descriptive fair use, or facilitation of such fair use, of a famous mark by another person other than as a designation of source for the person's own goods or services, including use in connection with--

**(i)** advertising or promotion that permits consumers to compare goods or services; or

**(ii)** identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner.

**(B)** All forms of news reporting and news commentary.

**(C)** Any noncommercial use of a mark.

**(4) Burden of proof**

In a civil action for trade dress dilution under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that--

**(A)** the claimed trade dress, taken as a whole, is not functional and is famous; and

**(B)** if the claimed trade dress includes any mark or marks registered on the principal register, the unregistered matter, taken as a whole, is famous separate and apart from any fame of such registered marks.

**(5) Additional remedies**

In an action brought under this subsection, the owner of the famous mark shall be entitled to injunctive relief as set forth in section 1116 of this title. The owner of the famous mark shall also be entitled to the remedies set forth in sections 1117(a) and 1118 of this title, subject to the discretion of the court and the principles of equity if--



WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(A)** the mark or trade name that is likely to cause dilution by blurring or dilution by tarnishment was first used in commerce by the person against whom the injunction is sought after October 6, 2006; and

**(B)** in a claim arising under this subsection--

**(i)** by reason of dilution by blurring, the person against whom the injunction is sought willfully intended to trade on the recognition of the famous mark; or

**(ii)** by reason of dilution by tarnishment, the person against whom the injunction is sought willfully intended to harm the reputation of the famous mark.

**(6) Ownership of valid registration a complete bar to action**

The ownership by a person of a valid registration under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register under this chapter shall be a complete bar to an action against that person, with respect to that mark, that--

**(A)** is brought by another person under the common law or a statute of a State; and

**(B)(i)** seeks to prevent dilution by blurring or dilution by tarnishment; or

**(ii)** asserts any claim of actual or likely damage or harm to the distinctiveness or reputation of a mark, label, or form of advertisement.

**(7) Savings clause**

Nothing in this subsection shall be construed to impair, modify, or supersede the applicability of the patent laws of the United States.

**(d) Cyberpiracy prevention**

**(1)(A)** A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person--

**(i)** has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

**(ii)** registers, traffics in, or uses a domain name that--

**(I)** in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;



WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(II)** in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or

**(III)** is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

**(B)(i)** In determining whether a person has a bad faith intent described under subparagraph (A), a court may consider factors such as, but not limited to--

**(I)** the trademark or other intellectual property rights of the person, if any, in the domain name;

**(II)** the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

**(III)** the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

**(IV)** the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

**(V)** the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

**(VI)** the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

**(VII)** the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

**(VIII)** the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

**(IX)** the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

**(ii)** Bad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful.



WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**(C)** In any civil action involving the registration, trafficking, or use of a domain name under this paragraph, a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark.

**(D)** A person shall be liable for using a domain name under subparagraph (A) only if that person is the domain name registrant or that registrant's authorized licensee.

**(E)** As used in this paragraph, the term "traffics in" refers to transactions that include, but are not limited to, sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration.

**(2)(A)** The owner of a mark may file an in rem civil action against a domain name in the judicial district in which the domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name is located if--

**(i)** the domain name violates any right of the owner of a mark registered in the Patent and Trademark Office, or protected under subsection (a) or (c); and

**(ii)** the court finds that the owner--

**(I)** is not able to obtain in personam jurisdiction over a person who would have been a defendant in a civil action under paragraph (1); or

**(II)** through due diligence was not able to find a person who would have been a defendant in a civil action under paragraph (1) by--

**(aa)** sending a notice of the alleged violation and intent to proceed under this paragraph to the registrant of the domain name at the postal and e-mail address provided by the registrant to the registrar; and

**(bb)** publishing notice of the action as the court may direct promptly after filing the action.

**(B)** The actions under subparagraph (A)(ii) shall constitute service of process.

**(C)** In an in rem action under this paragraph, a domain name shall be deemed to have its situs in the judicial district in which--

**(i)** the domain name registrar, registry, or other domain name authority that registered or assigned the domain name is located; or

**(ii)** documents sufficient to establish control and authority regarding the disposition of the registration and use of the domain name are deposited with the court.


WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**(D)(i)** The remedies in an in rem action under this paragraph shall be limited to a court order for the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark. Upon receipt of written notification of a filed, stamped copy of a complaint filed by the owner of a mark in a United States district court under this paragraph, the domain name registrar, domain name registry, or other domain name authority shall--

**(I)** expeditiously deposit with the court documents sufficient to establish the court's control and authority regarding the disposition of the registration and use of the domain name to the court; and

**(II)** not transfer, suspend, or otherwise modify the domain name during the pendency of the action, except upon order of the court.

**(ii)** The domain name registrar or registry or other domain name authority shall not be liable for injunctive or monetary relief under this paragraph except in the case of bad faith or reckless disregard, which includes a willful failure to comply with any such court order.

**(3)** The civil action established under paragraph (1) and the in rem action established under paragraph (2), and any remedy available under either such action, shall be in addition to any other civil action or remedy otherwise applicable.

**(4)** The in rem jurisdiction established under paragraph (2) shall be in addition to any other jurisdiction that otherwise exists, whether in rem or in personam.

CREDIT(S)

(July 5, 1946, c. 540, Title VIII, § 43, 60 Stat. 441; Pub.L. 100-667, Title I, § 132, Nov. 16, 1988, 102 Stat. 3946; Pub.L. 102-542, § 3(c), Oct. 27, 1992, 106 Stat. 3568; Pub.L. 104-98, § 3(a), Jan. 16, 1996, 109 Stat. 985; Pub.L. 106-43, §§ 3(a)(2), 5, Aug. 5, 1999, 113 Stat. 219, 220; Pub.L. 106-113, Div. B, § 1000(a)(9) [Title III, § 3002(a)], Nov. 29, 1999, 113 Stat. 1536, 1501A-545; Pub.L. 109-312, § 2, Oct. 6, 2006, 120 Stat. 1730; Pub.L. 112-190, § 1(a), Oct. 5, 2012, 126 Stat. 1436.)

15 U.S.C.A. § 1125, 15 USCA § 1125
Current through P.L. 119-100. Some statute sections may be more current, see credits for details.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.



WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.